IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANICE GILLETTE,                          )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )          Case No. 13-cv-2540-TJJ
                                          )
UNIFIED GOVERNMENT OF                     )
WYANDOTTE COUNTY/KANSAS CITY,             )
KANSAS,                                   )
                                          )
                    Defendant.            )

## MEMORANDUM AND ORDER

Plaintiff, Janice Gillette, is an employee of the Board of Public Utilities ("BPU"), an administrative agency of Defendant Unified Government of Wyandotte County/ Kansas City, Kansas.[1] She claims that BPU discriminated against her in violation of Title VII of the Civil Rights Act of 1964,[2] on the basis of her gender, subjected her to a hostile work environment, and retaliated against her.

The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.[3] This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 92). Defendant requests that the Court enter summary judgment in its favor under Fed. R. Civ. P. 56 and D. Kan. Rule 56.1 as to all of

---

[1] Plaintiff's claims are properly brought against the Unified Government of Wyandotte County/Kansas City, Kansas because the Board of Public Utilities is not a legal entity which can be sued. *See* K.S.A. 13-1223 ("The board [of public utilities] may sue and be sued but only in the name of and on behalf of the city except it shall have no standing in any court as a party plaintiff in any litigation against the city.").

[2] 42 U.S.C. § 2000e *et seq.*

[3] *See* Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, ECF No. 67.

Plaintiff's claims.  As explained below, the motion is granted in part and denied in part.  It is granted with respect to Plaintiff's hostile work environment claim, but denied with respect to her gender discrimination and retaliation claims.

## I.      Facts

The following facts are either uncontroverted or related in the light most favorable to Plaintiff, the party opposing the summary judgment motion.[4] Immaterial facts and factual averments not properly supported by the record are omitted.[5]

### A.      Facts Relevant to All Counts

Plaintiff is a female employee who is currently employed by the BPU.  Plaintiff has been an employee of BPU since February 9, 1987.

### B.      Plaintiff Applies for the Electric Meter Tester Trainee Position

On May 8, 2012, the BPU posted a job opening for the position of Electric Meter Tester Trainee ("EMTT").  The EMTT position is a bargaining unit position and is not an entry-level position.  There are six "essential functions" of the EMTT position, denoted by an asterisk on the job description: (1) Test new and old meters and make them ready for field installation; (2) Clean, repair and calibrate new and old meters; (3) Clean, repair, program and test K.W. demand registers; (4) Maintain, test and repair equipment used to test electric meters and associated equipment; (5) Program electronic meters and recording equipment; and (6) Phase angle test

---

[4] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[5] *Burkholder v. Gates Corp.*, No. 09-2322-KHV, 2011 WL 124537, at *2 n.2 (D. Kan. Jan. 14, 2011).

meter installation.  The job description also stated the following "Position Requirements (Abilities):"

> Incumbent must have knowledge of basic meter operating principles, and be familiar with wiring and installation of meter bases, current transformers and test switches. Must be able to attend schools as outlined by the Electric Meter Tester Training program. Must be willing to work shift changes during scheduled classroom training, and overtime as required. Must possess a valid driver's license, and have a good safety and attendance record.[6]

Under "Education/Experience," the job description stated: "High School/GED.  Background in electric meter installation."[7]

Plaintiff applied for the EMTT position.  At the time she applied, Plaintiff had knowledge of basic meter operating principles and was familiar with wiring and installation of meter bases, current transformers and test switches. At the time she applied, Plaintiff also had a college degree, was able to attend schools as outlined by the Electric Meter Tester Training program, was willing to work shift changes during scheduled classroom training and overtime as required, possessed a valid driver's license, had a good safety and attendance record, and had mechanical skills necessary to effect necessary repairs.

After receiving applications for the EMTT position, Jessica Leiker ("Leiker") in Human Resources ranked the applicants by divisional seniority on the job bid packet.  Ranking serves as an indication of the applicants Human Resources expects will be interviewed for the position. Leiker ranked the applicants by divisional seniority because bargaining unit positions are typically awarded based on seniority.

---

[6] BPU's EMTT job description, ECF No. 96-1.

[7] *Id.*

Leiker ranked Plaintiff first on the job bid packet because Plaintiff had the highest divisional seniority of any applicant for the EMTT position.  Richard Peel ("Peel") and James Ogan ("Ogan") had the second and third highest divisional seniority of all applicants for the EMTT position, respectively.

Initially, the requisition for the EMTT position contained one open position.  After Don Michalski ("Michalski"), the Superintendent of Electric Metering, discussed the need for additional EMTTs with Bill Johnson ("Johnson"), who was BPU's Manager of Electric Operations and Technology, Johnson allowed Michalski to hire three EMTTs.  Michalski convinced Johnson "that there was truly a need for adding more staff" and "attrition was going to take place quicker than what [Michalski] had hoped."

Michalski interviewed Plaintiff for the EMTT position on July 17, 2012. During the interview, Michalski told Plaintiff that Field Service Representative is in the line of progression for the EMTT position.  Plaintiff had never been a Field Service Representative and was not a member of the electric metering and services department.  At the end of Plaintiff's interview for the EMTT position, Michalski asked Plaintiff whether she would be interested in the EMTT position if either Ogan, Edward Nelson ("Nelson"), or Peel—the three Field Services Representatives who received interviews—declined the position or withdrew.  Michalski purportedly interviewed Plaintiff so that she could be awarded the position if one of the three men who were initially offered the position declined or withdrew.

Ogan, Nelson, and Peel were awarded the three EMTT positions.  They were the only applicants who had held the position of Field Service Representative.  On August 1, 2012, after working in the EMTT position for approximately 20 days, Peel withdrew.  Then, Michalski, who

wanted to hire three EMTTs, wanted to place Plaintiff in the position left open by Peel's withdrawal.

On August 17, 2012, Plaintiff emailed Michalski to advise she "recently became aware" that Peel had withdrawn and to inquire about "the status of the now open position." Johnson claims he told Michalski before and after August 17, 2012, that the EMTTs had to come from within the electric metering and services department. Because Michalski did not know how to respond and he believed that Human Resources should respond, he forwarded Plaintiff's email to Leiker in Human Resources. Leiker recommended that Michalski tell Plaintiff that the third position would not be filled "due to there being no qualified candidates." At that time, Leiker had never heard anything—whether from Michalski or Johnson—about a condition that the EMTTs had to come from within the electric metering and services department. Later on August 17, Michalski responded to Plaintiff's email, stating "we are not filling the 3rd position at this time due to there being no qualified candidates." Plaintiff immediately followed up, inquiring of Michalski "[w]ho made this decision?"

Leiker recommended that Michalski tell Plaintiff that Michalski and Johnson had made the decision that the third EMTT position would not be filled. As of August 20, 2012, Leiker still had never heard anything—whether from Michalski or Johnson—about a condition that the EMTTs hired by Michalski had to come from within the electric metering and services department.

On August 20, 2012, when Michalski had not responded to her most recent email, Plaintiff inquired of Michalski whether he could not or had chosen not to share the information about who made the decision not to fill the third EMTT position. Michalski responded that he and Johnson made the decision.

Prior to 2007, the job description for the EMTT position expressly stated that a background in electric meter installation was "preferred."  In 2007, BPU removed the word "preferred" from the job description.  Michalski had in the past awarded the EMTT position to male candidates Michalski knew had no background in electric meter installation.

Neither the collective bargaining agreement, nor the job description for the EMTT position states that the Field Service Representative position is in the line of progression for the EMTT position.  Both Johnson and Michalski acknowledged that one does not have to be a Field Service Representative in order to be an EMTT.  The EMTT position had been awarded in the past to male candidates who had never been Field Service Representatives.  No woman has ever held the EMTT position.

### C.    Plaintiff is Treated Differently Than Past Male Pole Yard Operators

Plaintiff became BPU's Pole Yard Operator on June 24, 2010.  The Pole Yard Operator position is within the Purchasing and Supply Department.  Nan Wolf ("Wolf"), Cynthia Johnson ("Cindy Johnson") and Julia Ford ("Ford") approved awarding the Pole Yard Operator position to Plaintiff.  Wolf was the Manager of the Purchasing Department.  Cindy Johnson was the Superintendent of Stores, who reported directly to Wolf.  Ford was the Supervisor of Stores, who reported directly to Cindy Johnson.  Plaintiff, as Pole Yard Operator, reported directly to Ford.  Plaintiff was the first woman to hold the position on a fulltime basis.  Wolf, Cynthia Johnson, and Ford are female.

Plaintiff's immediate predecessor—Bernie Lister—made no effort to train Plaintiff in any facet of the Pole Yard Operator position and he retired one week after she assumed the position.  On numerous occasions, Plaintiff complained to her supervisors and colleagues about Lister's lackluster training efforts, and sought additional instruction or assistance.

6

Shortly after beginning in the Pole Yard Operator position, Plaintiff noticed the Boom Truck Operators refused to assist her in the Pole Yard, even though they had in prior years always assisted Lister with lifting heavy wire or in general clean-up. Plaintiff was later advised by several Boom Truck Operators that they had been directed by Mike Kline not to help Plaintiff in any way and to stay completely out of the Pole Yard.  Mike Kline was Director of Electric Distribution and Transmission from June 21, 2008 to October 1, 2011, when he retired.  The Director of Electric Distribution and Transmission has no supervisory authority over and is not within the same division as the Pole Yard Operator position, and has no authority to hire, fire, demote, or otherwise discipline a Pole Yard Operator.

On September 27, 2010, Ford and Cindy Johnson signed an Employee Performance Evaluation for Plaintiff, which recognized that Plaintiff had been faced with numerous challenges upon her appointment. When Plaintiff was presented with this Employee Performance Evaluation, Plaintiff again notified Ford she had not been trained in the Pole Yard Operator position.

On May 24, 2011, Plaintiff emailed Ford, Cindy Johnson, and Wolf, with a copy to Sam DeLeon ("DeLeon") and Stephanie Sestrich from Human Resources.  In the email, Plaintiff stated that she had observed that the lunch period time only applied to her and she had documented instances of preferential treatment of other employees.  She stated her supervisors' noticeable dislike of her "promotes and creates a hostile working environment and a division in the work force."

On April 11, 2011, Plaintiff had an accident while operating the Pettibone machine. Following the accident, Ford and Wolf signed a Supervisor Accident Investigation Report.  The Supervisor Accident Investigation Report described the "action or failure to take action and/or

7

condition [that] contributed most directly to this accident" as follows: "When the Pettibone is first started it takes awhile for it to warm up. It is parked in a fairly limited space." When Ford presented the Supervisor Accident Investigation Report to Plaintiff, Ford told Plaintiff "don't worry about this, it's not going to result in anything," that "[t]here's not going to be any discipline involved, we all know it's a piece of shit." The same day, Wolf, together with Ford and Cindy Johnson, approved the issuance of a Conduct Memorandum against Plaintiff. A Conduct Memorandum for careless workmanship regarding the Pettibone accident was issued and Plaintiff received a 90-day probation.

Plaintiff grieved the issuance of the Conduct Memorandum pursuant to the collective bargaining agreement between the union and the BPU. In response, on June 22, 2011, a Third Step Grievance Meeting was held regarding the Conduct Memorandum issued to Plaintiff. Wolf, Ford, DeLeon, and Plaintiff attended the meeting. Steve White ("White"), who is the union's current business manager and former president and agent, also attended the meeting. During the meeting, White and Plaintiff asserted the Conduct Memorandum was improper because Plaintiff had notified her supervisors about her lack of training. At the June 22, 2011 Third Step Grievance meeting, Wolf became upset and shook her fist at Plaintiff and screamed that "she was so sick of you employees that do not take responsibility for your actions."[8] When Plaintiff defended herself, Wolf responded by threatening to reevaluate Plaintiff's job title and to "look

---

[8] Wolf admitted in her deposition that she was mad at Plaintiff, may have shaken her fist, and said to stop blaming everything on management. Wolf dep. 189:17–190:10, ECF No. 113-4. Taking the facts in the light most favorable to Plaintiff for purposes of summary judgment, the Court accepts Plaintiff's characterization of Wolf's actions.

into" lowering Plaintiff's wages.[9]  Plaintiff alleges Ford agreed that was a great idea, and suggested that, since Plaintiff's union representative was present, they should simply reevaluate Plaintiff's job and pay immediately.

After the Third Step Grievance Meeting, Plaintiff met with DeLeon and White. During this meeting with DeLeon and White, Plaintiff told DeLeon that she had been treated differently in the Pole Yard, trained inadequately, required to do things male counterparts were not required to do, and subjected to burdensome and arbitrary demands and punitive oversight.  Plaintiff also expressed concern to DeLeon that she would be retaliated against in the future for voicing her concerns during the Third Step Grievance Meeting.

Plaintiff followed up with email to DeLeon the following day, June 23, 2011, regarding their private meeting with Whit after the Third Step Grievance Meeting.  In the email, Plaintiff again expressed her concern to DeLeon that "there will be retaliation toward me either now or in the future."

On July 21, 2011, Plaintiff was informed that BPU's General Manager's office and Human Resources Department had initiated an investigation regarding the concerns Plaintiff submitted in her June 23, 2011 email.  On August 8, 2011, Plaintiff was informed that, on June 29, 2011, Don Gray and Jim Epp met with the members of Plaintiff's management team to address Plaintiff's concerns.  Wolf, Cindy Johnson and Ford were Plaintiff's management team.

Plaintiff filed an EEOC Charge on January 28, 2013, in which she asserted that:

---

[9] Both Wolf and Ford denied threatening to lower Plaintiff's wages or have her job title reevaluated in their depositions.  Wolf dep. 190:11–19.  Ford dep. 70:22–71:4, ECF No. 113-3.  However, taking the facts in the light most favorable to Plaintiff, the Court accepts Plaintiff's characterization for purposes of ruling on Defendant's summary judgment motion.

BPU has unlawfully discriminated against [Plaintiff] on the basis of her sex.  BPU has also retaliated against [Plaintiff] for reporting sex discrimination to BPU's human resources department and to the I.B.E.W. and for utilizing the grievance procedure approved within the BPU's working rules. The acts of discrimination have created a hostile work environment.  Please see attached.

Three-hundred days prior to January 28, 2013 is April 3, 2012.  Plaintiff's charge asserted she was subjected to a hostile work environment while employed as Pole Yard Operator. Plaintiff's charge outlined various factual allegations regarding a hostile work environment; the majority of these allegations occurred prior to April 3, 2012.

###### D.      Plaintiff Applies for the Procurement Contract Coordinator Position

On July 19, 2012, BPU posted a job opening for the position of Procurement Contract Coordinator.  This position is responsible for following BPU's procurement procedures and shepherding procurement contracts through the procurement procedures.

Plaintiff applied for the position of Procurement Contract Coordinator in August 2012. At the time Plaintiff applied for the Procurement Contract Coordinator position, Plaintiff had a high degree of proficiency in keyboarding and document preparations.  She also had experience with procurement; specifically, in previous employment with Swift/Eckridge Corporation, Plaintiff had completed product orders and helped arrange transportation of product to varying states.  She also had experience with financial systems and PeopleSoft.  Plaintiff's resume demonstrated knowledge of BPU's past and present practices of inventory and materials used in the storeroom, which knowledge was valuable to be able to communicate with vendors and end-users of the materials BPU purchases. Plaintiff's resume also demonstrated Plaintiff had a business degree, which was preferred for a variety of reasons.

Wolf, with assistance from Leiker, chose which employees would be interviewed. Applicants Minnie Milan, Kimberly McKinney, Misha Cobbins, and Josef Perez were selected to

be interviewed for the Procurement Contract Coordinator position. Minnie Milan withdrew before her interview. Leiker wanted to primarily interview Misha Cobbins and Josef Perez for their prior contractual experience. Minnie Milan and Kimberly McKinney were granted interviews based on their experience in clerical bargaining positions within the Stores Department. Plaintiff did not receive an interview for the Procurement Contract Coordinator position. It was Wolf's decision not to grant Plaintiff an interview.

Nothing on either Minnie Milan's resume or Kimberly McKinney's resume showed that they were knowledgeable about contract law and procedures acquired with three to five years related experience.

Misha Cobbins withdrew her bid for the Procurement Contract Coordinator position on September 4, 2012. Wolf offered Josef Perez the Procurement Contract Coordinator position. Perez immediately declined the offer, withdrawing his bid for the position on September 12, 2012.

Notwithstanding Misha Cobbins's withdrawal of her job bid, Wolf awarded the Procurement Contract Coordinator position to Misha Cobbins on September 14, 2012.

The BPU Employee Handbook provides:

> If you refuse a position awarded to you, you shall not be eligible to bid for another BPU position again for six months. If you wish to withdraw your bid, you must do so within 24 hours after the interview. If you decide to return to your previous job within the 30-day trial period, you shall not be eligible to bid again for six months.

BPU asserts the following as its legitimate, nondiscriminatory reasons for why Plaintiff did not receive an interview for the Procurement Contract Coordinator Position:

> Plaintiff did not meet the minimum requirements to be considered for the position. Specifically, the position required knowledge of contract law and procedures acquired with 3-5 years related experience, as well as a high degree of

proficiency in keyboarding and document preparations and experience with procurement, financial systems, and PeopleSoft.

## II.   Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(c)(1) further provides that the party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

"The court need consider only the cited materials, but it may consider other material in the record."[10]  When ruling on a motion for summary judgment, a court must view the evidence and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.[11]

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."[12]  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."[13]  If the moving

---

[10] Fed. R. Civ. P. 56(c)(3).

[11] *Scott*, 550 U.S. at 378.

[12] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[13] *Id.*

party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."[14]   Summary judgment is not a "disfavored procedural shortcut," but is an important procedure "designed to secure the 'just, speedy and inexpensive determination of every action.'"[15]

## III.    Summary of Plaintiff's Claims

Plaintiff asserts that she is entitled to recover under the following theories:

- **Count I - Title VII Gender Discrimination**.  Plaintiff alleges that Defendant denied Plaintiff promotional opportunities in violation of Title VII, specifically by discriminating against her because she is a woman.

- **Count II - Title VII Hostile Work Environment**.  Plaintiff alleges that Defendant subjected Plaintiff to a hostile work environment in violation of Title VII, specifically by subjecting Plaintiff to an offensive, intimidating, and oppressive atmosphere while Plaintiff worked in the Pole Yard Operator position because Plaintiff is a woman.

- **Count III - Title VII Retaliation**.  Plaintiff alleges that Defendant denied Plaintiff promotional opportunities in violation of Title VII, specifically by retaliating against her for complaining to BPU's human resources department of disparate treatment and for utilizing the grievance procedure approved within BPU's working rules.

---

[14] *Id.*

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## IV.    Title VII Gender Discrimination Claim

Plaintiff claims that Defendant discriminated against her on the basis for her gender when she was passed over for one of the three EMTT positions that Defendant offered to men with less divisional seniority.  She also argues that Defendant discriminated against her when one of the three males offered an EMTT position subsequently withdrew and Defendant chose to leave his position unfilled rather than offer it to Plaintiff.

Defendant moves for summary judgment on both of these bases for Plaintiff's gender discrimination claim, arguing that Plaintiff cannot establish a prima facie case of gender discrimination, and cannot show the Defendant's purported legitimate, non-discriminatory reasons for failing to award her an EMTT position are pretextual.  Defendant contends it is entitled to summary judgment because Plaintiff was not qualified for the EMTT position and because Plaintiff has not established a genuine issue of material fact regarding that issue.

### A.    Legal Standard

Title VII of the Civil Rights Act of 1964 prohibits, among other things, unlawful employment discrimination on the basis of an individual's sex. When a plaintiff offers direct evidence of discrimination in a Title VII claim, the claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green.*[16] Direct evidence is evidence that demonstrates, on its face, that the employment decision was reached for discriminatory reasons.[17] Circumstantial evidence is that from which a fact finder can

---

[16] 411 U.S. 792, 802–03 (1973).

[17] *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).

draw a reasonable inference that discrimination occurred.[18]  When evidence of discrimination is

circumstantial, rather than direct, a plaintiff's claim is subject to the *McDonnell Douglas* burden-

shifting framework.[19]

Under the *McDonnell Douglas* framework, a plaintiff carries the initial burden of

establishing a prima facie case of discrimination.[20]  If the plaintiff states a prima facie case, then

the burden shifts to the defendant employer to state a legitimate "non-discriminatory reason" for

its adverse employment action.[21] If the employer meets this burden, then summary judgment is

warranted unless the plaintiff can show there is a genuine issue of material fact as to whether the

proffered reasons are pretextual.[22]

Plaintiff claims that Defendant discriminated against her because of her gender when it

did not award her one of the three EMTT positions, but instead offered those positions to three

men with less divisional seniority.  Plaintiff does not provide any direct evidence of gender

discrimination; the Court therefore must analyze Plaintiff's claim under the *McDonnell Douglas*

burden-shifting approach.

To state a prima facie case of gender discrimination based upon circumstantial evidence,

a plaintiff must demonstrate by a preponderance of the evidence that (1) she belongs to a

protected class; (2) she applied for an available position for which she was qualified; and (3) she

---

[18] *Id.*

[19] *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990).

[20] *Id.* at 1007.

[21] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[22] *Id.*

was "rejected under circumstances which give rise to an inference of unlawful discrimination."[23] The plaintiff's burden of establishing a prima facie case at this stage is "not onerous."[24] Furthermore, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment."[25]

### B.     Plaintiff has Established a Prima Facie Case of Gender Discrimination

It is undisputed that Plaintiff (a woman) belongs to a protected class and that she applied for an open and available EMTT position.  She therefore satisfies the first element and the first part of the second element.  Plaintiff has presented evidence that she was ranked "1" (by seniority) on the interview sheet from the human resources department and she was interviewed for the EMTT position.  It is uncontroverted that she possessed all of the "position requirements/abilities" set out in the job description.  She also presented evidence that Michalski, who interviewed her, believed her to be qualified for the EMTT position.  Thus, she satisfies the second part of the second element.  Finally, as to the third element, Plaintiff presented evidence that the EMTT position is a bargaining unit position, in which seniority is considered, and the position has never been held by a female.  She also presented evidence that she was not offered one of the three EMTT positions even though Michalski considered her qualified, and that Defendant offered all three position to male applicants with less divisional seniority than Plaintiff.  Based on this evidence, a reasonable jury could conclude that Plaintiff was rejected

---

[23] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[24] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *Burdine*, 450 U.S. at 253).

[25] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

under circumstances which give rise to an inference of unlawful discrimination.  The Court finds

that Plaintiff has thus satisfied the requisite standard at this stage to establish a prima facie case

of gender discrimination, with regard to Defendant's action in not offering Plaintiff one of

Defendant's three EMTT positions.

**C.      Defendant has Established a Facially Nondiscriminatory Reason for Not Selecting Plaintiff**

 Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant

employer to articulate some legitimate, nondiscriminatory reason for its employment action.[26] If

a defendant articulates a legitimate reason, then the plaintiff's burden to prevail on summary

judgment is only to demonstrate a genuine dispute of material fact as to whether the proffered

reasons were pretextual. [27]

Defendant's proffered reason why Plaintiff was not awarded one of the three EMTT

positions at issue in this case is that she was not qualified for the position.  As bases for not

awarding the EMTT position, Defendant states that Plaintiff had not previously held the position

of Field Service Representative and that Plaintiff did not have experience in electric meter

installation.[28]

The Court finds that Defendant has met its burden of providing a facially non-

discriminatory reason for not awarding Plaintiff one of the three EMTT positions. The only

remaining issue, then, is whether Plaintiff has shown that there is a genuine dispute of material

fact as to whether Defendant's proffered reasons for the challenged action are pretextual.

---

[26] *Orr*, 417 F.3d at 1149.

[27] *Id.*

[28] Def.'s Reply in Supp. of Mot. for Summ.  J. 9, ECF No. 113.

### D.   Plaintiff has Presented Sufficient Evidence from Which a Jury Could Find Defendant's Proffered Reasons were Pretextual

A plaintiff can show pretext by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[29]  T]he evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms.[30]  A plaintiff typically makes a showing of pretext with: (1) evidence that the defendant's stated reason is false; (2) evidence that the defendant acted contrary to a written policy; or (3) evidence that the defendant acted contrary to an unwritten policy or practice when making the adverse decision affecting the plaintiff.[31]  Evidence of pretext may also include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."[32] The plaintiff's evidence can also allow for an inference that the employer's proffered non-discriminatory reasons were "either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."[33]

---

[29] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[30] *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[31] *Id.*

[32] *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005), as modified on denial of reh'g en banc (Dec. 20, 2005).

[33] *Plotke*, 405 F.3d at 1103.

Plaintiff asserts Defendant's proffered reason that she was not offered one of the three EMTT positions because she did not have "basic meter installation experience" by having worked as a Field Service Representative, is unworthy of belief.  She argues that both Michalski and Johnson admitted that applicants did not need to be a Field Service Representative or have basic meter installation experience to be qualified for the EMTT position. Michalski also admitted that he had in the past awarded the EMTT position to male candidates he knew did not have a background in electric meter installation.

Plaintiff also points out that Michalski testified that he believed Plaintiff was qualified for the EMTT position.  Plaintiff contends the supposed requirement of a background in electric meter installation was merely a pretext to avoid giving her the EMTT position, a position no woman has ever held, because Michalski knew Plaintiff would otherwise get the EMTT position due to her divisional seniority.

Plaintiff next asserts that Defendant's efforts to suggest there is some "informal" line of progression from Field Service Representative to the EMTT position is contrary to both written policy and past practices.  Plaintiff points out that the Field Service Representative position is not and has never been in the line of progression for the EMTT position.  BPU's collective bargaining agreement requires any line of progression to be stated on the face of the job description, but the job description for the EMTT position says nothing about any such line of progression and the union has never heard about this supposed "line of progression." Furthermore, Plaintiff argues that BPU's past practice was to award the EMTT position to applicants with the highest divisional seniority, regardless of whether the applicant was a Field Service Representative, had any background in electric meter installation, or had any knowledge of basic meter operating principles.  Plaintiff had the highest divisional seniority of any

applicant, but was nevertheless passed over for the EMTT position. She argues this supposed "informal line of progression" was merely a pretextual way for Michalski to justify to Plaintiff and human resources why Plaintiff did not receive the job.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence from which a jury could find Defendant's proffered reasons for terminating Plaintiff's employment were a pretext for gender discrimination. Defendant contends it is uncontroverted that a background in electric meter installation is a requirement for the EMTT position.  However, while it is uncontroverted that the Job Description for the EMTT position for which Plaintiff applied does list "background in electric meter installation," Plaintiff offers evidence raising a genuine dispute of material fact whether this really was a "requirement" for the EMTT position.  Michalski testified he was not aware, at the time Plaintiff interviewed, that the word "preferred" had been removed from the EMTT Job Description.[34]  He testified that change did not make any difference in what he was looking for during the EMTT position interviews.[35]  Michalski testified he still would have offered an EMTT position, under the revised Job Description, to an applicant with no background in electric meter installation.[36]  Further, Plaintiff presented evidence showing that in the past the EMTT position had been offered to male applicants who did not have a background in electric meter installation, when there were no applicants with such a background.  Specifically, Steve Gomez ("Gomez")

---

[34] Michalski dep. 127: 5–9, ECF No. 106-4.

[35] Michalski dep. 127:10–13.

[36] Michalski dep. 127:20–128:5.

and Danny Vega ("Vega") were hired for former EMTT positions although neither of them had a background in electric meter installation.[37]

Defendant also contends it is uncontroverted that Plaintiff did not have a background in electric meter installation.  However, Michalski—the "subject matter expert"—believed Plaintiff was qualified for the EMTT position and could do the job.[38]  He checked the "yes" box on Plaintiff's interview form sheet for the question "Candidate can perform essential functions."[39] Moreover, he further explained that because the position is a training position, he did not expect an applicant to be able to actually perform the essential functions of the position, but instead he considered whether the applicant could learn how to perform the essential functions.[40]  When asked the series of questions relating to whether Plaintiff possessed each of the specific abilities required for the EMTT position or could learn them, Michalski answered in the affirmative in each instance:

> Q. When you interviewed Janice Gillette did you believe she had the ability to clean, repair, program, and test KW demand registers?
>
> A. Yes.
>
> Q. When you interviewed Janice Gillette, did you believe she had the ability to learn how to maintain, test, and repair equipment used to test location meters and associated equipment?
>
> A. Yes.

---

[37] Michalski dep. 103:12–16.

[38] Michalski dep. 71:25–72:3.

[39] Michalski dep. 71:1–5; External/Internal Interview Guide, ECF No. 106-7.

[40] Michalski dep. 76:2–77:6.

Q. When you interviewed Janice Gillette, did you believe that she had the ability to learn how to program electronic meters and recording equipment?

A. Yes.

Q. When you interviewed Janice Gillette, did you think that she had the ability to learn how to phase angle test meter installations?

A. Yes.

Q. When you [interviewed] Janice Gillette did you think she had the mechanical skills to effect necessary repairs?

A. Yes.

Q. Okay. When you interviewed Janice Gillette did you believe that she was able to  attend schools as outlined by the electric meter tester training program?

A. Yes.[41]

Furthermore, Defendant's stated reasons for not awarding Plaintiff an EMTT position

have shifted and are inconsistent. Leiker from Human Resources recommended that Michalski

inform Plaintiff there were no qualified candidates for the EMTT position (which would include

Plaintiff) after Peel withdrew. Yet, Michalski testified he thought Plaintiff was qualified and

Johnson testified that he "was not sure what all [Plaintiff's] prior experiences [were],"[42]  and

"[could not] remember saying [to Michalski] that she's qualified or not qualified."[43]  Later in his

deposition, when questioned by his employer's counsel, Johnson testified, "I do not believe

[Plaintiff] was qualified or is qualified" for the EMTT position.[44]  In its response to a discovery

---

[41] Michalski dep. 78:3–79:5.

[42] Johnson dep. 61:10–11, ECF No. 96-5.

[43] Johnson dep. 61:22–23.

[44] Johnson dep. 87:9–10.

requests asking Defendant to state "each and every reason" for its failure to promote Plaintiff to the EMTT position, Defendant made no mention of the fact that Plaintiff was not a member of the electric metering and services department or had not been a Field Service Representative, stating instead that:

> Plaintiff did not demonstrate a knowledge of basic meter operating principles and did not have sufficient familiarity with wiring and installation of meter bases, current transformers or test switches. Plaintiff did not have a background in electric meter installation.[45]

But later Defendant agreed it was uncontroverted (but immaterial) that at the time she applied Plaintiff *did* have knowledge of basic meter operation principles and was familiar with wiring and installation of meter bases, current transformers and test switches.  Moreover, it stated that "Defendant has *only* asserted that plaintiff was not qualified because she lacked experience in electric meter installation as required by the job description."[46]  Defendant's shifting reasons for not awarding Plaintiff an EMTT position raise a question of fact regarding pretext.

Plaintiff also offers evidence supporting her argument that Defendant's "informal line of progression" reason was contrary to the BPU's collective bargaining agreement, which requires that any line of progression be stated on the job description. The EMTT job description lacks any such stated line of progression.  Defendant argues that the fact Michalski and Johnson "believed" there was a line of progression from Field Service Representative precludes a finding of pretext. However, Michalski and Johnson admitted one does not have to be a Field Service Representative to become an EMTT. Defendant also argues it hired Gomez and Vega (who had not been Field Service Representatives) because no other applicants at that time were Field

---

[45] Def. BPU's Resp. to Pl.'s First Interrog. No. 5, ECF No. 106-2.

[46] Def.'s Reply in Supp. of Mot. for Summ.  J. 9, ECF No. 113.

Service Representatives.  But they also had no meter installation experience, no knowledge of basic meter operating principles, and Michalski admitted were not otherwise qualified for the EMTT position.[47]  These examples do not advance Defendant's argument; if Defendant had in the past hired unqualified men who had not been Field Service Representatives for the EMTT position, then why was Plaintiff, who had the highest divisional seniority, not hired in this case?

Based on this and other evidence, a reasonable jury could find that any informal line of progression from Field Service Representative to the EMTT position was pretextual.  Plaintiff has presented sufficient evidence from which a jury could find that Defendant's proffered reasons for not awarding Plaintiff one of the three EMTT positions were a pretext for gender discrimination.

Plaintiff has established a prima facie case of gender discrimination. Although Defendant provided facially non-discriminatory reasons for not offering Plaintiff an EMTT position, Plaintiff has presented sufficient evidence from which a jury could find that those reasons were a pretext for discrimination.  Plaintiff's claim of gender discrimination based on Defendant's failure to award her one of the three initial EMTT positions, therefore, withstands Defendant's motion for summary judgment.

## V.      Gender-Based Hostile Work Environment Claim

Plaintiff's next claim is that Defendant subjected her to a hostile work environment in violation of Title VII, specifically by subjecting Plaintiff to an offensive, intimidating, and oppressive atmosphere while Plaintiff worked in the Pole Yard Operator position, because Plaintiff is a woman.  Defendant contends that Plaintiff's hostile work environment claim fails as

---

[47] Michalski dep. 99:20–100:23.

a matter of law because she did not comply with the timing requirements to file her charge with the EEOC and because she cannot establish the necessary elements of a hostile work environment claim.

### A.     Timely Exhaustion

Under 42 U.S.C. § 2000e–5(e)(1), a charge must be filed within 180 days after the alleged unlawful employment practice occurred, but if "the person aggrieved has initially instituted proceedings with a State or local agency" a charge must be filed by or on behalf of the person aggrieved within 300 days after the alleged unlawful employment practice occurred.  "In a deferral state such as Kansas, a Title VII claimant must file his discrimination charge with the appropriate state or local agency, or with the EEOC, within 300 days of the alleged unlawful act."[48]

Defendant asserts that it is entitled to summary judgment because all but one of the acts that Plaintiff alleged in her EEOC charge as constituting her hostile work environment claim did not occur within 300 days of the date she filed her charge.  Given that Plaintiff filed her EEOC charge on January 28, 2013, at least one of the discriminatory acts contained in the charge must have occurred after April 3, 2012, in order for the charge to be timely.  Plaintiff does not dispute that April 3, 2012 is the pivotal date after which at least one of the alleged discriminatory acts must have occurred in order for Plaintiff's hostile work environment claim to be timely.

The Supreme Court has made clear that the court's task "is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment

---

[48] *Peterson v. City of Wichita, Kan.*, 888 F.2d 1307, 1308 (10th Cir. 1989) (citing 42 U.S.C. § 2000e-5(e); *EEOC v. Commercial Office Prod. Co.*, 486 U.S. 107 (1988)).

practice, and if so, whether any act falls within the statutory time period."[49]  A series of alleged events constitute a hostile environment where the pre- and post-limitations period incidents involve the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.[50] If any claim which constitutes part of a hostile work environment is filed within the requisite time period, then the employee may recover for all acts that are part of the hostile work environment, even those which would otherwise be time-barred if they were discrete acts of discrimination.[51]

Plaintiff asserts that her hostile work environment claim arises out of the following four acts: (1) the acts of Plaintiff's supervisors in April 2012, in subjecting Plaintiff to an unsafe work environment by failing to repair Defendant's Pettibone equipment; (2) the actions of Michalski and Johnson in July 2012, in denying Plaintiff the EMTT position because of her sex; (3) the actions of Wolf in August 2012, in denying Plaintiff an interview for the Procurement Contract Coordinator position in retaliation for complaints about disparate treatment, lack of training and hostile working environment; and (4) the actions of Ford and Cindy Johnson in January 2013, chastising other workers who went to the Pole Yard to assist Plaintiff in unloading materials that weighed tons.  Plaintiff claims each of these four acts took place within 300 days of her charge and her hostile work environment claim is therefore timely.

Defendant argues that Plaintiff, in an attempt to avoid summary judgment based on her failure to timely file her charge, has tried to recharacterize her EEOC charge by incorporating

---

[49] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).

[50] *Morgan*, 536 U.S. at 120.  *See also Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005) (discussing application of exhaustion requirement to hostile work environment claims).

[51] *Morgan*, 536 U.S. at 119.

allegations not contained within it. Defendant contends that the only allegation the Court should consider for purposes of timeliness of the hostile work environment charge is Plaintiff's allegation that her supervisors subjected her to an unsafe work environment due to their failure to repair the Pettibone machine in April 2012. Defendant further argues that the Court should discount this allegation because it is factually untrue. It points to an email Plaintiff sent two weeks after filing her charge, in which she states that the Pettibone machine was not taken to the garage because of safety issues and was not returned to the Pole Yard in an unsafe working condition.

> Plaintiff alleges the following on the face of her EEOC charge:
>
> BPU has unlawfully discriminated against Gillette on the basis of her sex. BPU has also retaliated against Gillette for reporting sex discrimination to BPU's human resources department and to the I.B.E.W. and for utilizing the grievance procedure approved within the BPU's working rules. The acts of discrimination have created a hostile work environment. Please see attached.[52]

Attached to the charge was an eight-page, single-spaced letter describing the particular acts and conduct underlying Plaintiff's claims ("EEOC Charge Letter"). In section B (titled "Gillette Begins to Experience Discrimination from Female Supervisors") of the EEOC Charge Letter, Plaintiff alleged that "[c]urrently, Wolf, Johnson, and Ford are subjecting [her] to extremely dangerous working conditions. The Pettibone machine is out of service. . . . Wolf, Johnson, and Ford have taken no action to have the Pettibone machine repaired, to find a replacement machine, or to secure assistance for [Plaintiff] . . . ."[53] Because the term "currently" as used in the letter must be viewed in the context of the date of the letter (January 28, 2013), this event

---

[52] EEOC charge, ECF No. 96-8.

[53] *Id.* The EEOC Charge Letter is also dated January 28, 2013.

allegedly occurred after April 2012 and therefore is timely.  Because this claim is filed within the requisite time period, Plaintiff may include in her hostile work environment claim all of the earlier acts that are part of the same alleged hostile work environment.  She may do so because the earlier alleged actions are of the same type and perpetrated by the same managers.

Defendant argues that Plaintiff's failure-to-repair-the-Pettibone-machine allegation should not be considered for purposes of timeliness because it has evidence in the form of an email from Plaintiff disavowing the allegation.  The email Defendant relies upon is dated February 13, 2013, and states that Plaintiff "never implied that the Pettibone was taken to the garage because of safety issues or was returned to the Pole Yard in an unsafe working condition."[54]  It is unclear from the email whether Plaintiff was referring to the events that happened around February 12-13, 2013, or to earlier events referenced in her January 28, 2013 EEOC Charge Letter.  The email thus raises factual issues, and the Court will not find Plaintiff's claim time-barred based merely upon the email without the benefit of clarifying testimony.

In any event, the Court need not base its ruling upon this issue because Plaintiff has alleged in her EEOC charge one other event to support her hostile work environment claim that occurred within the requisite 300-day period,  Namely, she alleged the actions of Ford and Cindy Johnson in January 2013, in chastising other workers who went to the Pole Yard to assist Plaintiff in unloading materials that weighed tons.  Plaintiff alleges in the final paragraph of her EEOC Charge Letter, as a P.S., that another worker who went to the Pole Yard to assist Plaintiff in unloading materials that weighed tons was chastised for doing so.  Although this event was not included on the face of the EEOC charge or in section B of the EEOC Charge Letter titled

---

[54] Pl.'s Feb. 13, 2012 email, ECF No. 96-10.

"[Plaintiff] Begins to Experience Discrimination from Female Supervisors," the Court determines that it is still part of the same alleged hostile work environment. The Court reads Plaintiff's use of the inclusive language "[t]he acts of discrimination have created a hostile work environment" on the face of her EEOC charge to encompass the January 2013 chastisement of a coworker for assisting Plaintiff in unloading materials. Moreover, this event was allegedly perpetrated by the same supervisors who Plaintiff alleges committed most of the other pre-April 2012 acts alleged to have created a hostile work environment. The Court finds that Plaintiff has alleged at least one act occurring after April 3, 2012, and thus within 300 days of her charge, as the basis for her hostile work environment claim. Plaintiff's hostile work environment claim is therefore timely.

### B.      The Merits of Plaintiff's Gender-Based Hostile Work Environment Claim

Plaintiff alleges that Defendant subjected Plaintiff to a hostile work environment in violation of Title VII, specifically by subjecting her to an offensive, intimidating and oppressive atmosphere while she worked in the Pole Yard Operator position, because she is a woman. Plaintiff was the first woman to hold the Pole Yard Operator position full time. Plaintiff alleges that immediately after attaining that position, her supervisors demanded Plaintiff perform tasks and undertake duties and responsibilities never required of Plaintiff's male predecessor, Bernie Lister. Plaintiff asserts that she has been met at every turn with inexplicable barriers to advancement, disparate treatment, lack of training and assistance and efforts to subject her to difficulty, grief, and to be held in disrepute by her colleagues.

Defendant contends it is entitled to summary judgment because Plaintiff cannot establish an issue of material fact regarding her gender-based harassment claim. It argues that Plaintiff has not provided any evidence that the alleged harassment occurred because she was a woman.

More importantly, Defendant argues Plaintiff has not established any evidence that the harassment would not have occurred but for her gender. It also points out that Plaintiff's supervisors, who are the alleged perpetrators of most of the harassment, are also women.

In *Meritor Savings Bank, FSB v. Vinson*,[55] the Supreme Court held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." However, not all harassment creates a hostile work environment; the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment."[56]

To bring a claim of gender discrimination based on a hostile work environment, Plaintiff must establish (1) discrimination on the basis of her gender and (2) that the discrimination was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[57]

### (1)    Plaintiff Has Not Sufficiently Shown the Alleged Acts of Hostile Treatment Were Because of her Gender

The first element of a hostile work environment claim—that acts of hostile treatment are based on gender—requires that the conduct be based on discriminatory animus against the employee's gender. A hostile work environment claim may arise in circumstances where the harasser engages in conduct "in such sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace," or

---

[55] 477 U.S. 57, 66 (1986).

[56] *Id.* at 67.

[57] *Penn. State Police v. Suders*, 542 U.S. 129, 146–147 (2004) (quoting *Meritor Sav. Bank*, 477 U.S. at 67); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012).

where "the harasser treats men and women differently in the workplace."[58] The "plaintiff must

produce evidence that she was the object of harassment because of her gender." At the same

time, the Court must be mindful that Title VII does not establish "a general civility code."[59]

In her Complaint, Plaintiff alleges the following acts perpetrated by her supervisors and

male peers drastically altered the conditions of her employment and created a hostile work

environment:

a.    Plaintiff's supervisors refused to provide her with adequate training to perform

her duties in the Pole Yard.

b.    Plaintiff's supervisors refused to train her to handle the Pettibone machine and

then issued her a Conduct Memorandum and placed her on probation, citing Careless

Workmanship after she had an accident with the Pettibone machine.

c.    Plaintiff's supervisors threatened to lower her wages.

d.    Plaintiff's supervisors delayed in repairing the Pettibone and subjected her to

unsafe working conditions.

e.    Mike Kline instructed Boom Truck Operators not to assist Plaintiff in the Pole

Yard even though they had previously assisted prior male Pole Yard Operators.

f.    Plaintiff was required to complete burdensome duties that were never required of

the previous male Pole Yard Operators.

g.    Plaintiff is required to itemize her timesheet even though it was never required of

the previous male Pole Yard Operators or other employees.

---

[58] *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1263 (10th Cir. 2005).

[59] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

  h. Plaintiff's supervisors continue to treat her with express hostility because she is a woman in a position traditionally held by men.

  In response to Defendant's summary judgment motion, Plaintiff asserts the following additional incident contributing to the hostile work environment:  the actions of Ford and Cindy Johnson in January 2013, chastising other workers who went to the Pole Yard to assist Plaintiff in unloading materials that weighed tons.

  To prevail on her hostile work environment claim, Plaintiff must show that the alleged discriminatory acts were because of her gender.[60] Conduct which is overtly sexual may be presumed to be based on gender; actionable conduct is not limited, however, to behavior motivated by sexual desire.[61] The Supreme Court has set forth three evidentiary routes a plaintiff may utilize to prove that discrimination was based on sex: (1) explicit or implicit proposals of sexual activity motivated by sexual desire, (2) harassment motivated by a general hostility toward members of one gender in the workplace, or (3) comparative evidence about how the defendant treated members of both sexes differently in a mixed-sex workplace.[62] Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of gender.[63]  Facially gender-neutral abusive conduct can support a

---

[60] *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).

[61] *Oncale*, 523 U.S. at 81.

[62] *Id.* at 80–81.

[63] *Oncale*, 523 U.S. at 81.

gender-based hostile work environment claim only when "viewed in the context of other, overtly gender-discriminatory conduct."[64]

Viewing the evidence in the light most favorable to Plaintiff and considering the totality of evidence, the evidence fails to show that the alleged conduct that created the hostile work environment claim was based upon or "because of" Plaintiff's gender.  While the actions, particularly by her supervisors, may indicate poor or questionable management practices or bias toward Plaintiff, there is an absence of evidence that these alleged actions were because of Plaintiff's gender.  For example, the allegations of inadequate training or outright refusal to train Plaintiff, failure to timely repair equipment, and of instructing co-workers not to assist Plaintiff or of chastising them for doing so, if true, reflect poor business or management practices generally but are not evidence of gender-based discrimination.  Without any evidence these actions were "because of" her gender, they do not constitute an actionable claim for hostile work environment.

Plaintiff's supervisors, Wolf, Ford, and Cindy Johnson, were also female.  Although this in of itself is not dispositive of Plaintiff's claim, it does suggest that the individuals were motivated by reasons other than Plaintiff's gender or hostility to women in general being in the Pole Yard Operator position.  There is evidence that other females had "stepped up" into the position of Pole Yard Operator; Plaintiff was just the first female to hold the position full time.[65]

---

[64] *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1102 (10th Cir. 1999).

[65] Gillette dep. 134:15–24.

Even one of the alleged perpetrators of the harassment, Ford, had previously worked as an interim Pole Yard Operator.[66]

The only fact that could arguably suggest that any of the conduct in question was motivated by Plaintiff's gender is that Plaintiff's predecessors, who were male, were not required to perform certain tasks, such as completing an inventory or fill out timesheets, that were required of Plaintiff when she became BPU's Pole Yard Operator.  However, the Court concludes that in the absence of any other overtly gender-discriminatory conduct or acts showing a gender-bias against women, there are other reasonable gender-neutral reasons why Plaintiff could have been required to perform these tasks.  The Court finds that Plaintiff's cited instances where her female supervisors treated her differently than her male predecessor—by requiring her to perform burdensome duties like an inventory, itemize her timesheet, and failing to train her— are insufficient to raise an inference of gender-based discrimination.[67]

Although Plaintiff has presented some evidence that her supervisors treated her differently than her male predecessor, Plaintiff's evidence fails to show that the complained-about behavior of Plaintiff's supervisors was because of her gender or gender-based animus. Plaintiff's predecessor retired.  It would not be unusual for some new or modified job requirements and responsibilities to be adopted.  Based on the evidence presented, Plaintiff has failed to come forward with sufficient evidence from which a jury could find she was subjected to a hostile work environment based on or because of her gender.  Employees "may have . . . to

---

[66] Gillette dep. 134:15–20; Michalski dep. 91:10–16.

[67] *See Morris v. City of Colo. Springs*, No. 09-CV-01506-PAB-MEH, 2010 WL 4853634, at *3 (D. Colo. Nov. 19, 2010), *aff'd*, 666 F.3d 654 (10th Cir. 2012) (finding plaintiff's general examples of instances where harasser treated male employees differently from female employees insufficient to raise an inference of gender-based discrimination).

withstand colleagues that do not like them, are rude, and may be generally disagreeable."[68] Accordingly, Plaintiff fails to establish the first element of her gender-discriminatory hostile work environment claim.

### (2)   The Alleged Conduct Was Not Sufficiently Severe or Pervasive to Constitute a Hostile Work Environment

Even if the Court were to find Plaintiff had made a prima facie showing that the alleged conduct was based upon her gender or gender-based animus, Plaintiff must also show that the alleged discrimination was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[69]  The Court finds that the alleged conduct was not sufficiently severe or pervasive to constitute a hostile work environment.

In assessing the objective severity of the harassment, the court will consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[70]  "Whether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents."[71]

In assessing the pervasiveness and severity of the allegedly harassing incidents, the court considers "the work atmosphere both objectively and subjectively, looking at all the

---

[68] *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008).

[69] *Penn. State Police*, 542 U.S. at 146–147.

[70] *Morgan*, 536 U.S. at 116.

[71] *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008).

circumstances from the perspective of a reasonable person in the plaintiff's position."[72] "The applicable test for a hostile work environment thus has both objective and subjective components."[73]  This dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended, and both must be proved.[74]  In other words, a reasonable person must find the environment to be hostile or abusive and the victim must actually perceive it to be so.[75] The severity inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target."[76]  "Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another."[77]

Considering the totality of the evidence viewed in the light most favorable to Plaintiff, the Court finds that a jury could not find Plaintiff's workplace to be permeated with discriminatory intimidation, ridicule, and insult so severe or pervasive as to alter the conditions of her employment.  From an objective perspective, the actions of Plaintiff's supervisors in refusing to provide adequate training for Plaintiff when she became the first fulltime woman Pole Yard Operator, issuing a Conduct Memorandum after the Pettibone machine incident, threatening to lower Plaintiff's wages, delaying repair of the Pettibone machine, requiring Plaintiff to complete burdensome duties, requiring Plaintiff to itemize her timesheets, and

---

[72] *Id.* at 1144.

[73] *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

[74] *Id.*

[75] *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

[76] *Morris*, 666 F.3d at 664.

[77] *Id.*

chastising other employees who helped her are neither pervasive nor severe enough to alter the conditions of the Plaintiff's employment and create an abusive working environment. Kline's alleged actions of instructing the Boom Truck Operators to not assist Plaintiff in the Pole Yard do not appear to be more than an isolated event as Kline was not even employed in the same division as Plaintiff. Finally, none of the alleged actions, viewed objectively, was so severe that it alone established a hostile work environment.[78]

After carefully considering Plaintiff's evidence concerning the alleged conduct, the totality of the circumstances, and the applicable standard for analyzing the severity and pervasiveness element of a hostile work environment claim, the Court concludes that a reasonable person would not find that the conduct alleged by Plaintiff to be severe or pervasive enough to create a hostile environment.[79] Although Plaintiff subjectively may have perceived her workplace to be abusive and hostile, the incidents of which she complaints are not sufficiently severe or pervasive to meet the objective component of the applicable test for a hostile work environment.

Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim.

**VI.     Retaliation Claim**

In her third claim, Plaintiff asserts that Defendant denied her an interview for the Procurement Contract Coordinator position in retaliation for utilizing the grievance procedure

---

[78] *See id.* at 666–67 (requiring isolated incident to be "especially egregious or extreme").

[79] *See  Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

approved within the BPU's working rules, and for complaining to the BPU human resources department and to the I.B.E.W. about the disparate treatment she was subjected to while in the Pole Yard Operator position.  She alleges that Defendant instead interviewed other less qualified candidates and offered— in violation of BPU's own policies and procedures— the Procurement Contract Coordinator position to another less qualified applicant who had already withdrawn her bid from consideration.

Plaintiff's third Title VII claim arises under 42 U.S.C. § 2000e–3, which "prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employment practices." A plaintiff establishes a prima facie case of retaliation by showing: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action.[80]  Defendant concedes Plaintiff has shown the first and second elements of her prima facie case—Plaintiff complained to her supervisors about disparate treatment, lack of training and hostile working environment, and those same supervisors later denied her an interview for the Procurement Contract Coordinator position.

With respect to the third element, Plaintiff must show a causal connection between Plaintiff's protected activity of complaining about disparate treatment and hostile work environment based upon her gender and the adverse employment action of being denied an interview for the Procurement Contract Coordinator position.  Plaintiff alleges that in both 2010 and June 22–23, 2011, she voiced her concerns to BPU about her colleagues' unlawful

---

[80] *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004).

discriminatory treatment.  She also filed a grievance of the April 11, 2011 Conduct

Memorandum issued by Wolf and Ford.

At the June 22, 2011 Third Step Grievance meeting, Plaintiff alleges that Wolf shook her

fist at Plaintiff and screamed that "she was so sick of you employees that do not take

responsibility for your actions."  When Plaintiff defended herself, Wolf responded by threatening

to reevaluate Plaintiff's job title and to "look into" lowering Plaintiff's wages.  Plaintiff alleges

Ford agreed that was a great idea, and suggested that, since Plaintiff's union representative was

present, they should simply reevaluate Plaintiff's job and pay immediately.

During the meeting with Plaintiff's management team of Wolf, Cindy Johnson, and Ford

on June 29, 2011, Don Gray instructed Wolf, Cindy Johnson and Ford not to retaliate. The

General Manager's office and Human Resources Department met again on August 3, 2011 to

discuss Plaintiff's concerns about retaliation.  Before applying for the Procurement Contract

Coordinator position, Plaintiff expressed her fears privately with DeLeon that she would not

receive serious consideration for the position because she had utilized the grievance procedure,

and because she had reported to the BPU human resources department and the I.B.E.W. that she

was being treated differently than her male predecessors in the Pole Yard Operator position.

Plaintiff contends that she did have contract experience that qualified her for the

Procurement Contract Coordinator position.  She further alleges that on August 28, 2012,

Defendant—through Wolf—retaliated against Plaintiff by denying her an opportunity to

interview for the Procurement Contract Coordinator position.  Plaintiff alleges that Defendant

did interview other applicants for the position who were less qualified and ultimately awarded

the position to a less qualified candidate who had withdrawn.

Defendant argues that Plaintiff has failed to show any causal connection between Plaintiff's complaints during the summer of 2011 and Defendant's decision not to grant Plaintiff an interview in August 2012.  However, the fact that Wolf was the decision-maker regarding who would be interviewed, combined with Wolf's statements and conduct toward Plaintiff during the summer 2011 grievance meetings, and the fact Plaintiff's complaints were still in play in August 2012, together are sufficient to make that causal connection.

Viewing all the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence to withstand summary judgment on her retaliation claim.  She has shown a sufficient causal connection at this stage between her protected activity of filing a grievance of the April 11, 2011 Conduct Memorandum and complaining to human resources in June 2011 about disparate treatment in her Pole Yard Operator position, and the adverse employment action of being denied an interview for the Procurement Contract Coordinator position in August 2012.  Plaintiff has thus demonstrated a prima facie case of retaliation.

As Plaintiff has established a prima facie case of retaliation, Defendant must come forward with a legitimate, non-discriminatory reason for not interviewing Plaintiff for the Procurement Coordinator position. Defendant's proffered legitimate reason for denying Plaintiff an interview for the Procurement Contract Coordinator position was that:

> Plaintiff did not meet the minimum requirements to be considered for the position. Specifically, the position required knowledge of contract law and procedures acquired with 3–5 years related experience, as well as a high degree of proficiency in keyboarding and document preparations and experience with procurement, financial systems, and PeopleSoft.[81]

---

[81] Def. BPU's Resp. to Pl.'s First Interrog. No. 6, ECF No. 106-2.

Plaintiff argues that Defendant's reasons for denying her an interview are pretextual, characterizing Defendant's reliance on an "experience with contracts" requirement as dubious and noting Defendant's abandonment of its previously proffered reasons for denying Plaintiff an interview for the Procurement Contract Coordinator position.[82]  She points out that while Defendant contends Plaintiff did not have any experience drafting, negotiating, or otherwise working with contracts, Wolf—the primary decisionmaker as to who received interviews for the Procurement Contract Coordinator position—personally requested to interview two people she knew did not have 3–5 years experience with contract law and procedures.  Wolf also admitted she had no idea what experience Misha Cobbins—who was ultimately awarded the Procurement Contract Coordinator position—had with contracts, if any.  Plaintiff also argues that Wolf admitted all of the "procedures on executing contracts" relevant to the Procurement Contract Coordinator were primarily handled by others at BPU.

Plaintiff also argues that Wolf admitted the Procurement Contract Coordinator does not draft contracts but rather relies on pre-drafted forms and BPU's legal department drafts any changes needed to pre-drafted forms.  Wolf admitted the Procurement Contract Coordinator relies on others to negotiate contracts and provide the information filled in on contract forms.  Wolf admitted the Procurement Contract Coordinator had to rely on BPU's general manager to actually review and sign off on any procurement contracts.

Plaintiff also cites other circumstances that she claims are indicative of Wolf's improper motive for denying Plaintiff an interview for the Procurement Contract Coordinator. First,

---

[82] In its reply in support of its summary judgment motion, Defendant makes clear:  "Plaintiff's qualifications outside her experience with contract or clerical experience are immaterial because Defendant has only asserted that plaintiff was not qualified for the position because she lacked experience with contracts."  Def.'s Reply in Supp. of Mot. for Summ. J. 24, ECF No. 113.

following the Pettibone machine accident, Wolf participated in issuing a Conduct Memorandum against Plaintiff for "careless workmanship," despite being aware that the condition of the machine as contributing directly to the accident. Plaintiff's grievance of the Conduct Memorandum ultimately led to a heated meeting between Plaintiff's supervisors, human resources personnel, and Plaintiff's union representative, during which Wolf threatened Plaintiff's job and pay. Plaintiff filed an internal complaint, which ultimately resulted in Wolf, Ford, and Cindy Johnson being counseled by human resources and BPU's General Manager's office and directed not to retaliate against Plaintiff. According to Plaintiff, Wolf was aware of Plaintiff's repeated complaints to her supervisors about disparate treatment, lack of training and hostile working environment at the time Wolf decided not to grant Plaintiff an interview for the Procurement Contract Coordinator position.

Finally, Plaintiff points out that Wolf ultimately offered the Procurement Contract Coordinator position to Misha Cobbins, who had previously withdrawn her bid for the position. Plaintiff also asserts that Wolf testified that the only contract experience listed on Cobbins's resume was that she had one year of contract experience executing real estate contracts in a former position with a realty company. However, Wolf nevertheless offered the position to Cobbins after Wolf's initial choice for the position—Josef Perez—also withdrew. Although Defendant claims Perez's withdrawal distinguishes Cobbins's situation, Defendant concedes that "[o]rdinarily, once an employee withdraws from a bid, they are no longer eligible for that position."[83]

---

[83] Def.'s Reply in Supp. of Mot. for Summ. J. 38–39, ECF No. 113.

The Court finds that Plaintiff has presented evidence establishing a genuine dispute exists as to whether the reasons asserted by Defendant for its failure to grant Plaintiff an interview for the Procurement Contract Coordinator position are pretextual.  The timing and individuals involved in determining who would receive interviews for the Procurement Contract Coordinator position suggest that Wolf may have been retaliating against Plaintiff for filing a grievance of the Conduct Memorandum issued by Wolf and Ford.  After Plaintiff filed her grievance of the April 11, 2011 conduct memorandum, a Third Step Grievance Meeting was held on June 22, 2011, at which Wolf allegedly made threats to reevaluate Plaintiff's position and lower her wages.  After the meeting, Plaintiff expressed to DeLeon her concerns of possible retaliation.  One year later, in July 2012, the Procurement Contract Coordinator position was posted, and Plaintiff applied for it in August 2012.  Wolf, who made the decision as to which applicants would receive interviews, did not offer Plaintiff an interview.

Defendant argues that Wolf's mere knowledge of Plaintiff's complaints is not sufficient to show retaliation, and that Plaintiff's claim of retaliation is mere speculation.  However, Plaintiff points to evidence that Wolf was not only aware of Plaintiff's complaints, but that she was angry at Plaintiff about them, threatening Plaintiff's job and pay.  Furthermore, while Defendant's asserted reason was that Plaintiff did not meet the minimum requirements to be considered for the position because she lacked three to five years contract experience.  Leiker testified that two of the candidates selected for interviews, Milan and McKinney, did not have documented three to five years contract experience.[84]  Wolf admitted at her deposition that

---

[84] Leiker dep. 40:2–23; 44:13–15; 55:11–12; Milan resume, ECF No. 107-6; McKinney resume, ECF No. 107-7.

McKinney's resume did not show any experience with contract law and procedures.[85] The applicant who ultimately was offered the position, Misha Cobbins, had only one year of contracts experience—obtained from executing real estate contracts as a real estate agent.[86]   Cobbins was offered the position despite previously withdrawing her bid for the job.   Defendant attempts to explain its decision to interview two candidates who it admits had no contract experience with the fact that those candidates had clerical experience.   But Defendant's explanation rings hollow. The minimum requirements Defendant stated for the position do not expressly reference clerical experience.   If Defendant intends to suggest that the requirement of "[a] high degree of proficiency in keyboarding and document preparation experience with procedure, financial systems, and PeopleSoft" equates to clerical experience, once again that cannot explain its decision not to interview Plaintiff, as Defendant does not controvert that Plaintiff had those skills.   Plaintiff has thus demonstrated sufficient inconsistencies and contradictions in Defendant's asserted reasons for denying Plaintiff an interview for the position, from which a jury could find Defendant's asserted reasons were pretextual.   Defendant's motion for summary judgment is therefore denied as to Plaintiff's retaliation claim.

---

[85] Wolf dep. 107:21–108:3.

[86] Wolf dep. 119:12–23; 128:5–13.

**IT IS THEREFORE ORDERED THAT** Defendant's Motion for Summary Judgment (ECF No. 92) is granted in part and denied in part.  Summary judgment is GRANTED in favor of Defendant on Plaintiff's claim she was subjected to a hostile work environment based on her gender.  Summary judgment is DENIED as to Plaintiff's gender discrimination and retaliation claims.

IT IS SO ORDERED.

Dated this 17th day of August, 2015, at Kansas City, Kansas.

_s/ Teresa J. James_
Teresa J. James
U. S. Magistrate Judge